**PHILLIPS v. ILLINOIS CENT. R. CO.**

Civ. A. No. 3752.

United States District Court
W. D. Louisiana, Shreveport Division.

June 3, 1953.

L. L. Lockard, Booth, Lockard & Jack, Shreveport, La., for plaintiff.

A. B. Freyer, Freyer, Goode, Nelson & Freyer, Shreveport, La., for defendant.

BENJAMIN C. DAWKINS, District Judge.

This suit was for damages under the Federal Employers' Liability Act, § 1, 45 U.S.C.A. § 51, alleging that plaintiff was thrown from a freight car on which he was working as a switchman, and seriously injured. The claim was that the engineer negligently applied the power to the train of some thirty-nine cars in a manner causing it to jerk violently, throwing him to the ground. Specifically, the complaint alleged:

"Petitioner shows that he was the switchman on this cut of cars and as was customary, he took a position on top of the last car of this cut and that when this rear car upon which he was riding approached this switch as above described, the cut of cars was slowed down by the engineer (apparently, to your petitioner, to handle the movement in the usual way) to about two miles per hour, whereupon, your petitioner proceeded to descend from the top of the car, down the side of the car, in the rear, using the ladder thereon for that purpose, and after he had made his first or second step down the ladder, a part of his body protruding above the car, through the fault of the engineer said cut of cars was given an unusually violent, unnecessary and unexpected jerk, precipitating petitioner to the ground and on to the rails and ties, resulting in very serious personal injuries to him as hereinafter described."

The defendant denied the charge and averred that plaintiff's injuries were due solely to his own negligence, alleging as follows:

"Further answering defendant alleges that, as a result of plaintiff's many years of the discharge of the identical service in which he was engaged at the time of the accident, he was fully aware and had complete knowledge of the movement of the train of cars and of the method and manner of handling same and that in slowing down, stopping and starting said train of cars the slack would be taken up between said cars and there would be what is commonly described as a jerk, which plaintiff could and should have anticipated and expected and made secure his hand hold and foot hold in anticipation thereof, by and with the appliances on said car for that purpose and his failure so to do was the sole and proximate cause of this accident, which is here urged as contributory negligence on his part in mitigation of any and all damage which he might otherwise claim to recover herein."

Plaintiff had been in the employ of defendant for some thirty-six years, most of the time as switchman, occasionally serving as engine foreman, and was at the time sixty years old.

At the conclusion of plaintiff's evidence, defendant moved for a directed verdict in its favor, as to which the court reserved decision, the case was completed and resulted in a verdict for the plaintiff in the sum of $68,800. This was followed by a motion for judgment notwithstanding the verdict and, in the alternative, for a new trial on the ground, first, that there was no substantial evidence to support it, and, second, that it was against the great weight of the evidence.

Plaintiff was a member of a switching crew whose duty it was to transfer the thirty-nine freight cars from Bossier City over a bridge across the Red River to what was called the West Yard in the City of Shreveport, Louisiana. After the cars were assembled for the transfer, plaintiff, according to his testimony, with the aid of another employee, went to the rear and tested the brakes and found that

"the air was coming through and it was O. K. and I gave him (the engineer) the signal to go ahead." As to what happened thereafter, he testified as follows:

"Q. Who was the engineer? A. Mr. Woodall. When I gave him the signal to come on, I got up and sat down. As we approached the switch by the Bossier Yard—it was about two and one-half car lengths before we got to it, I proceeded to get down where I would be in a position to throw the switch and as I started down—

\* \* \* \* \* \*

"As I started down the side of the car, I had just one hand hold on top of this car with my left-hand. I had my left foot on the second grab iron and was just in the act of reaching down and catching the other with my right-hand and right foot going down, which they usually go in unison, I heard this cut of cars had slowed down—they were running, I would say, not over a mile an hour—very slow. As I started down, I heard the slack being jerked out of the cars, yes, sir, and I grabbed with my right-hand because I could hear it. I don't know whether I got hold, or not but if I had I think it would have jerked two good holds loose."

The other employees of the defendant, including the engineer, conductor and train foreman, denied that there was any unusual or violent jerking of the train. It is undisputed that the engineer was using "straight air" from the engine instead of the emergency brakes. In the normal movement of trains such as this, there is necessarily a considerable jerking and stopping as incidental to the coupling, uncoupling, switching and making up of freight trains without fault or negligence on the part of the engineer or others. In other words, the very nature of the work is hazardous and it is only when the defendant or some of its employees perform their duties in a manner which a reasonable man in the same situation would not do, because of the increased danger involved, that liability arises if it be the proximate cause of the injury and following damages. It is a question, at least, of the exercise of reasonable care in the particular circumstances of the work. Defendant seems to concede that the engineer of a train of the kind involved here could so handle it as to cause a man of experience in the usual and ordinary operation to be thrown from a box car; but defendant, of course, denies that there was any such operation in this instance. On the other hand, plaintiff, in the light of his experience, asserts that there was a violent and sudden forward jerking of the train which dislodged his hold on the grabirons and precipitated him to the ground, in spite of his efforts to avoid falling. This, of course, presents a question of fact, as to whether there was or was not such a violent movement, and the issue was one for the jury in the light of all the evidence, to be determined by the exercise of their judgment as to its weight and the credibility of the witnesses. The fact that the plaintiff's version was supported mainly by his own sworn testimony while the evidence of defendant's witnesses tended to support the contention that there was no unusual handling of the train does not create a situation where this court could lawfully say that the verdict was not supported by substantial evidence. It would seem that plaintiff's experience of more than thirty years in this kind of work without a similar accident, so far as the record shows, should be given some weight; yet, on the other hand, there was always the possibility that he might become careless. We know there is a rule of evidence that the matter is not to be determined necessarily by the number of witnesses on either side. Even if the court should conclude that the preponderance of the evidence was not with the plaintiff, or even that it was on the side of the defendant, there does not appear to be reason to believe that another jury would find differently to what this one has done. The interest of the plaintiff in the outcome, and the fact that the wit-

nesses on defendant's sides are its employees, must both be considered by either the court or a jury in attempting to arrive at the truth. The court is, therefore, of the view that the motion for judgment notwithstanding the verdict should be denied.

■ However, the court believes that the recovery is excessive. The work-life expectancy of a railroad switchman, because of the very nature of his work and its inherent dangers, is considerably less than that of many other occupations. The evidence in this case, it is believed, supports the conclusion that it did not exceed a period of six years. Plaintiff's earnings, when working full time, were in excess of $5,000 per year, or would amount to a total of approximately $30,000 over his work-life expectancy, without applying the necessary discount to its present value to be paid in a lump sum. This would leave more than $38,000 to cover pain, suffering, doctor bills, etc. The plaintiff is not wholly disabled to perform any kind of work, although he cannot return to the rather strenuous and hazardous work of a switchman. He can still perform work not requiring heavy physical effort. Then, too, he is eligible for retirement pay, although the evidence does not disclose what this may be in addition to what he receives from this suit. There was, undoubtedly, from the very nature of the injuries, considerable suffering, confinement to hospitals, operations, etc., and he still has a condition in his left arm similar to what, in the ordinary parlance, is called numbness, which has caused the habit of rubbing the hand and arm at frequent intervals, but the evidence did not show that it involved any substantial pain. Taking all things into consideration, including the present depreciated purchasing value of money, it is believed that plaintiff would be fully compensated by the allowance of the sum of $20,000, in addition to the loss of earnings caused by his injuries, and that a total recovery of $50,000 would be adequate.

Therefore, the motion for a new trial will be granted unless the plaintiff shall, within twenty days from the filing of this memorandum, enter a remittitur of all in excess of that sum.